The STATE of Ohio, Appellee,

v.

SILVERMAN, Appellant.

[Cite as *State v. Silverman*, 176 Ohio App.3d 12, 2008-Ohio-618.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22097.

Decided Feb. 15, 2008.

**14**

Mathias Heck, Montgomery County Prosecuting Attorney, and R. Lynn Nothstine, Assistant Prosecuting Attorney, for appellee.

Frank A. Malocu, for appellant.

DONOVAN, Judge.

{¶ 1} This matter is before the court on the notice of appeal of Doron C. Silverman, filed March 22, 2007. On July 21, 2006, Silverman was indicted on two counts of rape, in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree, and one count of gross sexual imposition, in violation of R.C. 2907.05(A)(4), a felony of the third degree. The victim, now deceased, was Silverman's four-year-old son.

{¶ 2} On August 28, 2006, Silverman filed a motion to suppress, which the state opposed. On September 20, 2006, a hearing was held on Silverman's motion. On October 10, 2006, the trial court issued a "Decision and Entry Overruling Defendant's Motion to Suppress."

{¶ 3} On October 27, 2006, the "State's Motion and Memorandum to Declare Complaining Witness Unavailable & Request for an Evid.R. 807 Hearing" was filed, and on November 3, 2006, an evidentiary hearing was held on the state's motion. Silverman and the state then filed posthearing memoranda. On December 11, 2006, the trial court issued a "Decision and Entry Finding Admissible the Statements of Mikel Silverman to Batya Silverman and Joseph Farber." Batya Silverman is Silverman's sister, and Joseph Farber is Batya's boyfriend.

{¶ 4} On December 14, 2006, following a jury trial, Silverman was found not guilty of both rape charges and guilty of the charge of gross sexual imposition (child under the age of 13). Silverman was designated a sexual predator and a habitual sex offender and sentenced to a five-year prison term.

{¶ 5} The events giving rise to this matter began on Memorial Day weekend, 2006, when Silverman, along with his wife, Heather Silverman, traveled from their home in West Carrollton, Ohio, along with Mikel and their three-month-old daughter, Keylee, to Indianapolis, Indiana, to visit Martin and Deanne Silverman and Batya. Martin and Deanne are Batya's and Silverman's adoptive parents, and Silverman and Batya are not biological siblings. Silverman's biological mother is Cindy Rottinghouse. After having dinner at the home of Martin and Deanne, Mikel accompanied Batya to her apartment to spend the night, while Silverman, Heather, and Keylee remained at the home of Martin and Deanne. The following day, Batya took Mikel swimming at the pool at her apartment complex. After spending a couple of hours at the pool, Batya returned to her apartment with Mikel, and she prepared to give him a bath to wash the chlorine from his hair and skin. When she undressed Mikel, Batya observed him pulling on his penis. Mikel liked to call Batya "Poti." While in the bathroom, Mikel looked up at Batya, while pointing to his penis, and said, "Poti, put your mouth on it."

{¶ 6} Batya, stunned, called Farber, who was at the apartment, to the bathroom and told him what Mikel had said. Farber asked Mikel why he said what he did. Mikel did not respond. Farber then asked Mikel if he had ever seen such behavior in a movie, and Mikel said no. Next, Farber asked Mikel if he had ever observed his mommy and daddy engaged in such behavior, and Mikel again responded no. Finally, Farber asked Mikel where he learned about that behavior, and Mikel responded, "Daddy did it." Mikel then said, "No more talk." Farber and Batya did not discuss the incident further with Mikel that day.

{¶ 7} The following day, Batya made lunch for Mikel, and she gave him some pens, markers, and a notebook so that Mikel could color. She and Farber then questioned Mikel again about the statements Mikel made the day before. Batya was a student at the time, majoring in social work, and she had just completed a class on appropriate interviewing techniques for children. In the course of the Evid.R. 807 hearing, Batya stated, "When you're interviewing a child about this, you don't want to imply anything to them. You don't want to say, did so and so do this to you, did this person do this to you, because that can—they can have that in their mind and you're not going to be able to change it and it can sway their thoughts about what happened."

{¶ 8} Batya stated, "I started by asking Mikel if he remembered what we had spoke about in the bathroom the day earlier, and he said that he did remember. And so, I asked him some similar questions. I asked him if he had ever seen that on a movie, and he again replied no. So, just to be clear, I asked him what kind of movies he watches at home, and he listed a few children's movies. So, then I

asked him if he had seen his mommy and daddy doing that, and he again replied, no, that daddy had done it.

{¶ 9} "So, I said to Mikel, do you do it to daddy, too? And he said, yes. And I said, well, what do you do to daddy's 'pee pee?' And he didn't respond to me. So, I asked him, do you kiss it? And he very clearly replied, 'No, I lick it.'

{¶ 10} "After that, Joe asked Mikel if anybody else had done this to him, and he replied, 'no, just daddy.' And Joe asked him if it was a secret. And Mikel said, 'Yes, no more talk.'

{¶ 11} "So, I explained to Mikel that I loved him very much and that he can tell me anything that has happened to him and he won't get in trouble. And he responded to me, 'No, I do get in trouble.'"

{¶ 12} Deanne Silverman then arrived at Batya's home, along with a friend of Batya's. Batya asked Farber and her friend to watch Mikel, and she returned to her parents' home with her mother. Later in the afternoon, Silverman and Heather returned from the Indianapolis 500. Rottinghouse was also present in the home, along with her friend, Pam. Deanne and Batya confronted Silverman with Mikel's statements. When Silverman did not respond, Deanne stated that Silverman had molested Batya years before. Silverman said he did not remember molesting Batya, and he ran from the house to an outside porch, accompanied by Heather. Batya then joined Heather and Silverman outside. Heather asked Silverman if he had done anything to Mikel, and Silverman said, "Maybe I did. I don't remember these things." Silverman then said that he would probably have to quit his job at Chuck E. Cheese, because it was too much of a temptation for him to work there.

{¶ 13} According to Batya, those remaining in the house joined Silverman outside, and they were very supportive of him. They decided that Rottinghouse would keep Mikel and Keylee for a week, and then return them to Deanne and Martin, who would keep them for ten days, "so that the children could be kept safe and so that Doron could go and get help."

{¶ 14} On June 5, 2006, however, Batya learned that Rottinghouse had returned Mikel and Keylee to Silverman and Heather. The following day, Batya contacted Children's Services in Montgomery County, and on June 10, 2006, she contacted the West Carrollton police department. An investigation ensued, during which Detectives Robert Bell and Mark Allison of the West Carrollton Police Department interviewed Heather and Silverman. Silverman admitted to having Mikel's penis in his mouth while in the bathtub with him and to fondling his son. Prior to Silverman's indictment on the above charges, Heather set fire to her family's home while Mikel and Keylee were inside, and both of the

Silverman children perished. Heather has yet to be tried, having initially been declared incompetent to stand trial.

{¶ 15} Silverman asserts six assignments of error. Silverman's first assignment of error is as follows:

{¶ 16} "The trial court erred by denying appellant's motion to suppress statements made by appellant during a custodial interrogation without obtaining a knowing, voluntary and intelligent waiver of his Miranda rights."

{¶ 17} Silverman argues that "a custodial interrogation took place and detectives failed to *Mirandize* Appellant" and that his confession was involuntary and the result of hostile treatment and promises of leniency.

{¶ 18} "Appellate courts give great deference to the factual findings of the trier of facts. At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. The trial court is in the best position to resolve questions of fact and evaluate witness credibility. In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." (Citations omitted.) *State v. Hurt*, Montgomery App. No. 21009, 2006-Ohio-990, 2006 WL 522388, ¶ 16.

{¶ 19} "It is well-established that the police are not required to administer *Miranda* warnings to every individual they question. The United States Supreme Court has held that police officers have a duty to advise a suspect of his rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 469–73, 86 S.Ct. 1602, 16 L.Ed.2d 694, when their questioning of the suspect rises to the level of custodial interrogation. A person is 'in custody' only if, under the totality of the circumstances, a reasonable person in the same situation would feel that he was not free to leave." (Citations omitted.) *State v. Wood*, Greene App. No. 2006 CA 1, 2007-Ohio-1027, 2007 WL 706807, ¶ 43.

{¶ 20} At the hearing on Silverman's motion to suppress, Detectives Bell and Allison testified, as did Silverman. Bell stated that he went to Silverman's home on June 12, 2006, that he spoke with Heather and asked her if the couple would come to the police department to speak to the detectives on June 13, 2006. Heather agreed, and Silverman and Heather arrived at the West Carrollton police department of their own accord on the 13th. Bell interviewed Heather first, for about an hour, while Silverman waited in the lobby. Silverman was not handcuffed, under arrest, or guarded while Bell interviewed Heather. At about 10:30 a.m., Bell then returned to the lobby with Heather and asked to speak to

Silverman. Silverman agreed; he did not ask to speak to Heather, but accompanied Bell to his office.

{¶ 21} Bell's office, which he shares with Allison, is about eight feet by 11 feet, and contains Bell's and Allison's desks, computers, and filing cabinets and two chairs. Allison was present in the office during almost all of the interview. Bell testified that he told Silverman that he was not under arrest, that Silverman did not have to talk to the detectives, and that Silverman was free to leave at any time. Silverman indicated to Bell that he understood. Bell did not administer *Miranda* warnings to Silverman.

{¶ 22} Bell obtained an oral statement from Silverman, initially asking Silverman for some background information. Bell learned that Silverman was 25 years old, had graduated with his G.E.D., "had a little bit of college," and worked at Chuck E. Cheese. Bell described the tone of the interview as "very soft," and he said that the detectives spoke "very quietly." At the completion of the oral interview, Bell asked Silverman to complete a written statement. Bell stated that Silverman was not threatened, and Silverman wrote a statement and then signed it. Then, to clarify some of the information he had obtained in the course of the interview, Bell wrote some questions on another piece of paper for Silverman to answer. Bell testified that Silverman was in no way coerced to write answers to the questions Bell presented to him. Allison also wrote a question for Bell to answer, and Bell testified that Silverman was again not forced to write an answer. Silverman signed the document containing the questions and answers, and Bell stated that he was not forced to do so. Bell testified that at one point, Allison indicated to Silverman that Silverman was "stonewalling." Bell did not remember Silverman's receiving a cell phone call during the interview. Bell stated that he believed that Silverman indicated to him that Silverman's children were at home with a babysitter, but he did not remember Silverman's asking to leave to relieve the sitter.

{¶ 23} At the completion of the interview, Bell escorted Silverman back to the lobby. According to Bell, the interview lasted approximately two hours, during which time Silverman did not ask to leave or ask for an attorney. Bell stated that Silverman never indicated that he was unwilling to answer the detectives' questions. Bell did not observe any signs of intoxication in Silverman's demeanor, and Silverman did not indicate any physical complaints to Bell. Bell testified that no promises were made to Silverman and that Silverman was not physically mistreated. At the conclusion of the interview, Bell thanked Silverman for coming in and observed Silverman leave with Heather.

{¶ 24} Silverman testified following Bell. Silverman stated that a detective arrived at his home on June 12, 2006, and spoke to Heather, and that he and Heather proceeded on their own accord to the police department the following

day. Silverman made arrangements with Chuck E. Cheese to miss work for the day. Silverman stated that he and Heather "were trying to do [their] best to cooperate." Silverman stated that he wanted to accompany Heather during her interview but was told he could not do so. He stated that he could not leave during Heather's interview, because he was her only ride home. Silverman stated that after Heather was interviewed alone, she appeared to be upset and that he was not permitted to have contact with her, although he admitted that he did not request to speak with her.

{¶ 25} Silverman stated that the interview began as a pleasant exchange but that after he received a cell phone call from his place of employment, "the tone of the questioning changed very quickly." According to Silverman, Allison told him to turn off his cell phone, saying, "We don't need those interruptions." Silverman stated that the interview "started to get hostile." Silverman testified, "I started to get up at one point, mentioning that our babysitter had a set time that she had to leave by. And when I did, they said to sit back down because we're not finished with you yet." Silverman also stated, "[Allison] stated that he's been doing this for years and that I'm doing what a therapist would call stonewalling, * * * like beating around the bush is how he explained it." Silverman testified, "[Allison] said that he already knows that I'm guilty and that I only have two choices. * * * I can either be locked up right now and it'll go to court and it'll be a giant mess or like they do with many cases, I can make a statement and the likelihood is it will never see the inside of a courtroom."

{¶ 26} Silverman felt trapped, he was worried about his wife, and he wanted to go home, according to his testimony. Silverman felt that he "had no other choice" but to talk to the detectives. Silverman stated that he "wasn't telling the truth or making stuff up" in responding to the detectives questions. He was "answering the questions in the way they wanted [him] to." In terms of the written statement Silverman was asked to write, he stated that he wrote it as he was instructed and that he "had no choice." Silverman stated that no one put a gun to his head, raised a hand to him, touched him, or threatened him with physical harm, but that Allison threatened him with jail time. Silverman stated that he asked if he needed a lawyer, explaining, "I had never dealt with detectives personally without like my mother present. So, I didn't know what was going on. I didn't know what to do." Silverman stated that the detectives did not answer his question about the lawyer but allegedly told Silverman that they were "just gathering information." Silverman stated that he was not intoxicated and that he had no physical complaints in the course of the interview. He did not believe he was free to leave until the detectives instructed him to leave.

{¶ 27} In rebuttal, Detective Allison's testimony was mostly consistent with Bell's. Allison was not present in the courtroom when Bell testified. Allison

stated that Bell informed Silverman that Silverman was not under arrest or in custody and that he was free to leave at any time. Allison stated that he was present for almost the entire interview, except that at its conclusion, he left the office to place a call to Children Services regarding Silverman's statements. Allison stated that Silverman did not ask for an attorney or ask whether he needed an attorney. Allison did not remember Silverman's receiving a call on his cell phone. Allison stated that Silverman never stood up to leave, and that Allison never told him to sit back down because the detectives were not finished with him. Allison stated that he never threatened Silverman, and that he did not tell him that unless Silverman told the detectives what they wanted to hear, Silverman would go to jail. Allison stated that Silverman never indicated that he had to leave because of a babysitter. According to Allison, Silverman never mentioned anything about a babysitter. Allison stated that he never indicated to Silverman that if he confessed, Silverman would not have to go to court.

{¶ 28} In its decision overruling Silverman's motion to suppress, the trial court determined that the interview was conducted in the manner described by Bell and Allison. The court noted that Bell and Allison testified to the same set of facts and noted the detectives' separation during testimony. According to the trial court, Silverman, "facing serious criminal charges, is the one who has a reason to shade the facts most favorably to his legal position." The court determined that the interview "was without coercion." The court went on to conclude that Silverman was not in custody and accordingly, the detectives were not required to advise Silverman of his *Miranda* rights. Finally, the court determined that Silverman's confession was voluntary: there "were no promises, threats, inducements or mistreatment of the Defendant."

{¶ 29} Having thoroughly reviewed the transcript of the hearing on Silverman's motion to suppress, we conclude that the evidence supports the trial court's determination that Silverman was not subject to custodial interrogation and entitled to be *Mirandized*. Silverman scheduled time away from his job, he drove himself to the police station, he was informed that he was not in custody and that he was free to leave at any time, he had the means to leave, and he indicated to the detectives that he understood the nature of the interview. In other words, under the totality of the circumstances, a reasonable person in the same situation as Silverman would feel that he was free to leave, and Detectives Bell and Allison were not required to administer *Miranda* warnings to Silverman.

{¶ 30} We further conclude that the evidence supports the trial court's determination that under the totality of the surrounding facts and circumstances, Silverman's decision to talk to the police was made voluntarily. Silverman was a 25–year–old adult when he made his confession. Silverman voluntarily presented himself to the detectives for the interview. Silverman was lucid and capable of

reasoning. There was no indication of intoxication or physical impairment. Silverman was told that he did not have to speak to the detectives and that he was free to leave, and he indicated to the detectives that he so understood. The length of the interview, approximately two hours, was not excessive. The interview was not physically coercive or overbearing, and Silverman was not mistreated, by his own admission. As the trial court noted, Silverman had reason to misrepresent the nature of the interview. The trial court was free to find the detectives' testimony more credible than Silverman's, and we rely upon and defer to the trial court's ruling regarding the weight and credibility of witness testimony. Despite Silverman's testimony to the contrary, the detectives made no promises to Silverman that if he confessed, he would "not see the inside of a courtroom." In other words, Silverman was not, as he argues, "unfairly coerced" or compelled into making his incriminating statements.

{¶ 31} Because Silverman was not in custody during his interview with Detectives Bell and Allison, and because his confession was voluntary, the trial court did not err in overruling his motion to suppress.

{¶ 32} There being no merit to Silverman's first assignment of error, it is overruled.

{¶ 33} Silverman's second assignment of error is as follows:

{¶ 34} "The trial court erred by admitting statements made by the deceased four-year-old victim."

{¶ 35} Silverman argues, as he did in his posthearing memoranda, that the state failed to establish Mikel's competency as a witness. Silverman also argues that the state failed to comply with Evid.R. 807 before it admitted Mikel's statements to Batya and Farber. According to Silverman, a "fundamental flaw in the trustworthiness of Mikel's statements is that Batya, the person proposing Mikel's statement (and Joe Farber, her boyfriend), holds a strong bias against the Defendant. Batya unsubstantially accused Defendant of raping her, and her distaste for Defendant places doubt on the means by which she elicited Mikel's statements." According to Silverman, admitting Mikel's statements, "absent a prior opportunity for cross-examination by the defendant, violates the accused's confrontation right under the Sixth Amendment to the United States Constitution." Finally, Silverman argues that there was no independent proof of the of the sexual acts with which Silverman was charged to corroborate Mikel's statements.

{¶ 36} "A reviewing court will not reverse the trial court's admission of evidence absent an abuse of discretion." *State v. Bellomy,* Montgomery App. No. 21452, 2006-Ohio-7087, 2006 WL 3849076. "An abuse of discretion connotes more

than a mere error of law or judgment. It implies an arbitrary, unreasonable, or unconscionable attitude on the part of the court." Id.

{¶ 37} Evid. R. 601(A) provides, "Every person is competent to be a witness except: * * * children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

{¶ 38} " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the Supreme Court of Ohio, by these rules, or by other rules prescribed by the * * * Supreme Court of Ohio." Evid. R. 802.

{¶ 39} Evid. R. 807 provides an exception to the hearsay rule as follows:

{¶ 40} "(A) An out-of-court statement made by a child who is under twelve years of age at the time of trial or hearing describing any sexual act performed by, with, or on the child * * * is not excluded as hearsay under Evid. R. 802 if all of the following apply:

{¶ 41} "(1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid. R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual act * * *.

{¶ 42} "(2) The child's testimony is not reasonably obtainable by the proponent of the statement.

{¶ 43} "(3) There is independent proof of the sexual act * * *.

{¶ 44} "(4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness

who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.

{¶ 45} "(B) The child's testimony is 'not reasonably obtainable by the proponent of the statement' under division (A)(2) of this rule only if * * *

{¶ 46} " * * *

{¶ 47} "(3) The court finds * * *

{¶ 48} "(a) the child is unable to testify at the trial or hearing because of death * * *.

{¶ 49} " * * *

{¶ 50} "(C) The court shall make the findings required by this rule on the basis of a hearing conducted outside the presence of the jury and shall make findings of fact, on the record, as to the bases for its ruling."

{¶ 51} Silverman relies upon the Ohio Supreme Court case of *State v. Said* (1994), 71 Ohio St.3d 473, 644 N.E.2d 337, for the proposition that the state failed to establish Mikel's competency. In *Said*, the defendant was convicted of gross sexual imposition, and the victims were his granddaughters, ages 15 and five at the time of trial. Before trial, the court held a hearing to determine whether the five-year-old was competent to testify under Evid. R. 601. The court failed to record the hearing, but a review of the transcript indicated that the trial court found the child competent. At trial, the five-year-old refused to testify, and the court conducted a hearing to determine whether her out-of-court statements to her mother and to a sexual-abuse investigator regarding the offense were admissible pursuant to Evid. R. 807. Without making findings of fact on the record, the trial court determined that the five-year-old's statements were admissible. The Supreme Court of Ohio determined that the trial court committed reversible error when it failed to record the competency hearing and also that it erred when it failed to make the findings required by Evid. R. 807(C), because "[f]indings in the form of skeletal conclusions are inadequate under Evid. R. 807." Id. at 478, 644 N.E.2d 337.

{¶ 52} *Said* stated:

{¶ 53} "A competency hearing is an indispensable tool in this and similar cases. A court cannot determine the competency of a child through consideration of the child's out-of-court statements standing alone. As we explained in *State v. Wilson* (1952), 156 Ohio St. 525, 46 O.O. 437, 103 N.E.2d 552, the essential questions of competency can be answered only through an in-person hearing: 'The child's appearance, fear or composure, general demeanor and manner of answering, and any indication of coaching or instruction as to answers to be given

**24**

are as significant as the words used in answering during the examination, to determine competency. * * *

{¶ 54} " 'Such important and necessary observations cannot be made unless the child appears personally before the court.' Id. at 532, 46 O.O. at 440, 103 N.E.2d at 556.

{¶ 55} "Evid. R. 807 clearly does not dispose of the need to find a child competent. Competency under Evid.R. 601(A) contemplates several characteristics. Those characteristics can be broken down into three elements. First, the individual must have the ability to receive accurate impressions of fact. Second, the individual must be able to accurately recollect those impressions. Third, the individual must be able to relate those impressions truthfully.

{¶ 56} "Out-of-court statements that fall within Evid. R. 807, like the other hearsay exceptions, possess a 'circumstantial probability of trustworthiness.' [5 Wigmore on Evidence (Chadbourn Rev.1979) ] at 253, Section 1422. In other words, under unique circumstances we make a qualified assumption that the declarant *related* what she believed to be true at the time she made the statement. However, those same circumstances do not allow us to assume that the declarant accurately *received* and *recollected* the information contained in the statement. Whether she accurately received and recollected that information depends upon a different set of circumstances, those covering the time from when she received the information to when she related it. As a result, even though a statement falls within a hearsay exception, two elements of the declarant's competency remain at issue and must still be established. Thus, a trial court must find that a declarant under the age of ten was competent at the time she made the statement in order to admit that statement under Evid. R. 807." (Emphasis sic; citations and footnote omitted.) Id. at 476–477, 644 N.E.2d 337.[1]

{¶ 57} In its "Decision and Entry Finding Admissible the Statements of Mikel Silverman to Batya Silverman and Joseph Farber," the court initially concluded that because Mikel is deceased, the requirement that his statements are "reasonably unobtainable" is met. 807(A)(2). In a footnote, the court noted, "It does not matter that this four-year-old child may not have been found competent to testify if he had survived because when a child is found not competent, the testimony is 'not reasonably obtainable' anyway." Next the court determined, "Defendant has made statements which are admissions of the acts charged in the indictment and

---

1. Here we note our disagreement with the Fourth District's rationale interpreting *Said* and holding, "Evid. R. 807 does not require the trial court to determine the competence of the declarant of an out-of-court statement under the age of ten when the child's testimony is rendered unavailable because of that child's death." *State v. Meadows* (Feb. 12, 2001), Scioto App. No. 99CA2651, 2001 WL 803822.

these admissions constitute independent proof of the sexual acts as required by * * * section (A)(3)." The court further determined that the state notified the defense in writing of Mikel's "statements, the time and place made, the witnesses, and the circumstances surrounding the statements," and that the state accordingly complied with Section (A)(4).

{¶ 58} In terms of the state's compliance with Evid. R. 807(A)(1), the court determined:

{¶ 59} "The totality of the circumstances surrounding the making of the statements provides particularized guarantees of trustworthiness, including the following:

{¶ 60} "1. The initial statement of the child was unsolicited and spontaneous. Although that statement was not a direct accusation, it was of a sexual nature and indicative of what the Defendant is accused of doing. The subsequent statements were not inconsistent.

{¶ 61} "2. The statements made on the second day were consistent with statements first made.

{¶ 62} "3. The witnesses who heard the statements were aware they should not suggest answers to the child by their questioning and they were careful in this regard. The child was not coached in regards to his statements, and the statements were given without input from Batya Silverman or Joe Farber.

{¶ 63} "4. The means by which the statements were obtained, i.e., spontaneous statement followed by unobtrusive questioning of the child, was not coercive or suggestive toward any particular response.

{¶ 64} "5. The child recognized the nature of the subject on both occasions when he said 'no more talk.'

{¶ 65} "6. There was no evidence that the child's mental state was out of the ordinary at the time of the statement, although he did appear agitated after his disclosure on the second day that he would get in trouble.

{¶ 66} "7. The terminology used by the child was not unexpected of one his age but the sexual acts he reported are not expected to be within a small child's knowledge unless he had observed such acts or he had been the victim of them.

{¶ 67} "8. There is no indication of either a motive or lack of motive to fabricate."

{¶ 68} Finally, the court concluded, "Excluding the independent proof by admission, the court determines there are particularized guarantees of trustworthiness that make the statements at least as reliable as statements admitted pursuant to Rules 803 and 804 in the Ohio Rules of Evidence. * * * The statements of Mikel Silverman which were testified to at the evidentiary hearing

are not excluded by the hearsay rule and are admissible under Rule 807 in the Ohio Rules of Evidence."

{¶ 69} The trial court, in the course of its analysis pursuant to Evid.R. 807, found in part that under the totality of the circumstances surrounding *the making of* Mikel's statements, particularized guarantees of trustworthiness existed. However, even if we make a qualified assumption that Mikel related what he believed to be true at the time he made the statements, for purposes of Mikel's competency, whether or not Mikel accurately *received and recollected* his impressions depends upon different circumstances that cover the time from when Mikel was abused to when Mikel related the abuse to Batya and Farber. Even if Mikel's statements fall within the hearsay exception provided by Evid. R. 807, the trial court, due to Mikel's death, was unable to analyze two elements of Mikel's competency prior to admitting his statements under Evid. R. 807, namely his accurate receipt and accurate recollection of his impressions. Because Evid. R. 807 does not dispose of the need to find a child competent pursuant to *Said,* the analysis under the rule must fail, as it lacks a fundamental prerequisite. Without a determination of competence, the trial court abused its discretion in admitting Mikel's statements.

{¶ 70} Because Mikel's inadmissible statements are not cumulative of the testimony of other witnesses and there is a lack of extrinsic evidence, this error did materially prejudice Silverman. Silverman's second assignment of error is sustained.

{¶ 71} Silverman's third assignment of error is as follows:

{¶ 72} "The trial court erred in failing to change venue of appellant's trial."

{¶ 73} Silverman argues that the voir dire herein "reveals that several jurors had knowledge of Appellant's case through publicity generated by [Silverman's] wife's murder case. * * * The voir dire indicates knowledge and bias against Appellant." Silverman then cites generally pages 301–554 of the trial transcript.

{¶ 74} "[A] change of venue is not automatically granted when there is extensive pretrial publicity. Any decision to change venue rests largely within the discretion of the trial court. '[A] careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 357 N.E.2d 1035. Also, a 'defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased.' *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 29." *State v. Frazier,* 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 235.

{¶ 75} At the start of voir dire, the trial court presented the venire with four categories of potential jurors, and it then asked the jurors to determine into which of the four categories each juror belonged. The trial court then questioned each juror privately at sidebar about his or her knowledge of the case. The court described the categories as follows: (1) "Jurors who are not familiar with case, news accounts, parties or attorneys and who have not formed an opinion about this case. That's someone that everything I've said so far does not have any impact on you, you don't know anything about it, and you could be fair and impartial because you haven't heard anything about it * * *." (2) "Jurors somewhat familiar with the case, may have heard news accounts, parties or attorneys, have some knowledge about that, who may recall some news broadcasts or writings, but not the details, and who have not formed an opinion about the case. So, people who may have heard something, you have something in the back of your mind, yeah, I think I heard about that case, but you really don't have any concrete memory of it and you don't know any specific details or you haven't formed an opinion about any of those things * * *." (3) "Jurors who are familiar with the case, news accounts, parties or attorneys, jurors who followed news accounts and recall specific details or reports, and who have formed or expressed an opinion about the case, but that opinion is not firmly held. That's people who are knowledgeable about some of the details, have talked about it among their friends or family, may have said what they think about the case to someone about their opinion about the case, that opinion is open ended in the sense that it is not a firm belief." (4) "Jurors who may be very familiar with the case, news accounts, parties or attorneys, closely followed news accounts, and have substantial recall of details of the reports and who have formed or expressed an opinion about this case and that opinion is firmly held."

{¶ 76} Once the jurors categorized themselves, the court explained its purpose in interviewing the jurors privately at sidebar regarding their individual knowledge of the case and any resulting bias against Silverman as follows: "The reason for doing this is if one of you remembers a lot of details and we ask you about [that] in the presence of everybody else, you may hear things about either this case or that other unrelated case that might give you an impression one way or the other that it['d] be better that you don't hear. So, unfortunately, this is the only method which I can think that we can go through this to try to get a fair and impartial jury."

{¶ 77} As the state correctly notes, several potential jurors were excused for cause after they indicated to the trial court that they were familiar with the case and were unable to set aside their personal feelings and consider the evidence in an impartial manner. When the jury was seated, the trial court overruled Silverman's motion for a change of venue, noting, "We have found a fair jury here

in this county." While Silverman then renewed all of his pretrial motions, he did not specifically indicate to the court that any juror in particular was actually biased, and he makes no such argument in his brief.

{¶ 78} Because the trial court excused those jurors, after addressing them privately at sidebar, who indicated a bias against Silverman, and was able to seat an impartial jury, the trial court did not abuse its discretion in overruling Silverman's motion for a change of venue. Silverman's third assignment of error is overruled.

{¶ 79} Silverman's remaining assignments of error are as follows:

{¶ 80} "The trial court erred in designating appellant as a sexual predator and a habitual sexual offender."

{¶ 81} "The state failed to provide sufficient evidence to prove beyond a reasonable doubt that appellant committed the charged offenses, and the jury's guilty verdict amounts to a manifest miscarriage of justice."

{¶ 82} "Appellant's sentence is inconsistent with sentences of similar offenders, a lesser sentence is commensurate with and would not demean the seriousness of the offense and impact of the victim and consecutive sentences are not justified."

{¶ 83} These assignments of error are rendered moot by our ruling on Silverman's second assignment of error. The judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

FAIN and GRADY, JJ., concur.