**[Cite as *State v. Tullis*, 2013-Ohio-3051.]**

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE   COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2012-CA-59 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2011-CR-607 |
| v. | : | |
| | : | |
| DAMERICK W. TULLIS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on the 12th day of July, 2013.

· · · · · · · · · · ·

STEPHEN K. HALLER, Atty. Reg. #0009172, by NATHANIEL R. LUKEN, Atty. Reg. #0087864, Greene County Prosecutor's Office, 61 Greene Street, Xenia, Ohio 45385
　　　Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. #0072135, 36 North Detroit Street, Suite 102, Xenia, Ohio 45385
　　　Attorney for Defendant-Appellant

· · · · · · · · · · · · ·

HALL, J.

{¶ 1}　Damerick W. Tullis appeals from his felony and misdemeanor convictions. Tullis argues that the trial court erred in overruling his motion to suppress the statements and confession he made to detectives during an interview. We affirm.

## I. Facts

{¶ 2}    On the morning of October 17, 2011, Detective Daniel Foreman called Tullis at Wright-Patterson Air Force Base, where Tullis worked, and asked him to come to the police department to discuss some cases. Tullis agreed and arrived at the department a little after noon the same day. Detective Foreman and Detective Ryan Whittaker met Tullis and took him to an interview room. Foreman told Tullis that he was not under arrest and that he was free to leave at anytime. The interview-room door locked automatically but was left ajar for most of the interview. The detectives closed it once for a short time because a S.W.A.T. Team member was making a lot of noise in the hall demonstrating a robotic camera.

{¶ 3}    The detectives questioned Tullis about an incident of voyeurism. They told Tullis that a witness had reported seeing him peering into a neighbor's windows. At first, Tullis denied that he had done this, but later, he confessed. Tullis also confessed to a second incident of voyeurism and confessed to burglary, kidnaping, and rape. The interview lasted about two hours. When the interview was completed, Tullis was allowed to leave the police department.

{¶ 4}    A few months later, Tullis was indicted on two counts of voyeurism, two counts of burglary, two counts of kidnaping, one count of attempted rape, and one count of rape. Tullis moved to suppress his statements and confession to the detectives, arguing that the detectives had failed to give him *Miranda* warnings and arguing that he had been coerced into confessing. At an evidentiary hearing, Detectives Foreman and Whittaker testified, and a video recording of the interview was admitted in evidence. The trial court overruled the motion to suppress, concluding that the detectives were not required to give Tullis *Miranda* warnings because he was not in custody and concluding that the detectives did not coerce Tullis's confession improperly.

{¶ 5}    Tullis pleaded no contest to all eight counts, and the trial court sentenced him to a

total of 20 years in prison.

{¶ 6}    Tullis appealed.

## II. Review

{¶ 7}    Tullis assigns two errors to the trial court, both related to his motion to suppress. The first assignment of error alleges that the court erred in determining that Tullis was not in custody for purposes of *Miranda*. The second assignment of error alleges that the court erred in determining that Tullis's confession was not improperly coerced. "The appeal of a motion-to-suppress determination presents a mixed question of fact and law. The trial court is the trier of fact. By virtue of this role it is 'in the best position to resolve questions of fact and evaluate the credibility of the witnesses.' For this reason, an appellate court is 'bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.' But the appellate court 'must independently determine as a matter of law * * * whether they [the facts] meet the applicable legal standard.'" *State v. Holtvogt*, 2d Dist. Montgomery No. 24748, 2012-Ohio-2233, ¶ 7, quoting *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994).

## A. Whether Tullis Was "In Custody"

{¶ 8}    Police must advise a person of his *Miranda* rights if they question the person while he is in custody. *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The first assignment of error challenges the trial court's determination that, when the detectives questioned Tullis, he was not in custody.

{¶ 9}    A person is in custody, for *Miranda* purposes, when he "is taken into custody or otherwise deprived of his freedom by the authorities in any significant way." *Id.* at 478. The

primary inquiry is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). In determining whether a person's freedom of movement was so restrained, what is examined is not the subjective views of the person or of the authorities but the "objective circumstances" of the questioning. *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). The test is "whether, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.'" *State v. Gumm*, 73 Ohio St.3d 413, 429, 653 N.E.2d 253 (1995), quoting *U.S. v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion).

{¶ 10} The parties here do not dispute the trial court's factual findings regarding the relevant circumstances. The questioning took place at the police station to which Tullis came voluntarily, with his wife, at the request of the detectives. The detectives told Tullis that he was free to leave at any time. They never gave the impression that Tullis was not free to leave. Tullis was not arrested. He was not handcuffed. And he was allowed to keep his cell phone, which he used during breaks in the interview. The interview took place in an interview room.[1] The door to the room locked automatically, but it was ajar for most of the interview. The two detectives who conducted the interview sat between Tullis and the door. A S.W.A.T. Team member was outside the room in the hall demonstrating the use of a robotic camera. The interview lasted about two hours. Tullis never asked about an attorney. He never indicated that he wanted to end the questioning. After the interview, Tullis left the station.

---

[1] Appellant's wife was not in the interview room.

{¶ 11} These circumstances are similar to those in *State v. Silverman*, 176 Ohio App.3d 12, 2008-Ohio-618, 889 N.E.2d 1034 (2d Dist.). In that case, the trial court had found that the defendant was interviewed at a police station to which he had come voluntarily. He was not arrested or handcuffed. Two detectives questioned the defendant in their office. They told the defendant that he was not under arrest, that he did not have to talk to them, and that he was free to leave at any time. The detectives questioned the defendant for about two hours. During that time, the defendant did not ask to leave, did not ask for an attorney, and did not indicate that he was unwilling to answer questions. In addition to these findings, the *Silverman* decision pointed out that the defendant had scheduled time away from his job, drove himself to the station, and had the means to leave. In those circumstances, this court concluded, a reasonable person would feel that he was free to leave. *Silverman* at ¶ 29.

{¶ 12} The only real differences between *Silverman* and the present case are the automatically locking door and the S.W.A.T. Team member. But we do not think that either of these circumstances requires a different outcome. Although the door locked automatically, it was ajar for most of the interview. And the S.W.A.T. Team member was not there to intimidate Tullis. As one of the detectives explained, "there were a couple of times during the interview where it was shut for a few minutes at a time. The first time, most notably, because there was one of the sergeants who is on the S.W.A.T. Team that was outside and he was demonstrating the use of a robotic camera and it became pretty noisy in the interview room." (Tr. 35).

{¶ 13} Tullis contends that when questioning occurs behind a locked door or in a situation where the person questioned requires help from police to leave the person is in custody. This is but one factor to consider in the custody analysis. In *State v. Carovillano*, 1st Dist.

Hamilton No. C-060658, 2007-Ohio-5459, the court determined that the defendant was not in custody even though the door to the interview room was locked during part of the questioning. The defendant agreed to the interview, and the police picked him up and brought him to the police station. He was not under arrest. He was not handcuffed. And he was never told that he could not end the interview. The interview-room door was locked during some of the questioning. But given the other circumstances, the court concluded that this factor did not "convert[] an otherwise voluntary interview into a custodial interrogation." *Carovillano* at ¶ 20. We conclude the same here.

{¶ 14} The two cases that Tullis cites plainly contain distinguishing circumstances. In *State v. Thompson*, 103 Ohio App.3d 498, 659 N.E.2d 1297 (12th Dist.1995), the police approached the defendant as he was about to enter his parents' house. They searched him and seized his car keys and cash. The police told the defendant that he was not under arrest but that they wanted his cooperation. They put him in the back of a cruiser and drove him to the police station where they questioned him. The police never told the defendant that he was free to leave. The court noted that the defendant depended on the police to take him home and told the officers that he needed an insulin shot. The court affirmed the trial court's determination that the defendant was in custody, concluding that the evidence supported the trial court's finding that "the police officers' actions 'ran contrary' to their verbal indications to [the defendant] that he was not under arrest." *Thompson* at 503. In *State v. Elliott*, 63 Ohio Misc.2d 114, 619 N.E.2d 1247 (M.C. 1993), the trial court found that "the restraint on the defendant's movement was of the degree associated with a formal arrest. He was surrounded by four police officers, all of whom were armed and in uniform. He was put in the back seat of a cruiser from which he could

not get out without the consent of one of the police officers, and he was separated from the police officers by a wire cage. He was, effectively, inside a mobile jail." *Elliott* at 117.

{¶ 15}   Considering the totality of the circumstances in which Tullis was questioned, we think that a reasonable person would have believed that he was free to leave.

{¶ 16}   The first assignment of error is overruled.

### B. Whether Tullis's Confession Was Voluntary

{¶ 17}   The second assignment of error challenges the trial court's determination that Tullis's confession was voluntary. Tullis contends that it was improperly coerced by the detectives.

{¶ 18}   Under the United States and Ohio Constitutions, a criminal suspect has a waiveable right not to incriminate himself. *State v. Jackson*, 2d Dist. Greene No. 02CA0001, 2002-Ohio-4680, ¶ 19. A waiver of this right must be a voluntary decision by the suspect. The voluntariness issue and the custody issue are "analytically separate issues." *Id.* at *¶* 21. "Even when *Miranda* warnings are not required, a confession may be involuntary and subject to exclusion if on the totality of the circumstances the defendant's will was overborne by the circumstances surrounding the giving of that confession." *Id.* at *¶* 22. A confession is voluntary "absent evidence that [the defendant's] will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *Id.* at *¶* 20. "[C]oercive police conduct is a necessary predicate to a finding of involuntariness." *State v. Winterbotham*, 2d Dist. Greene No. 05CA100, 2006-Ohio-3989, ¶ 32, citing *State v. Cooey*, 46 Ohio St.3d 20, 544 N.E.2d 895 (1989). The voluntariness test considers "the totality of all the surrounding facts and circumstances, including the characteristics of the accused and the details

of the interrogation." *Jackson* at ¶ 21. This includes factors like "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements." *Id.*

{¶ 19}   Here the trial court found that Tullis was 20 years old at the time, that his mental state was normal, that he was not impaired by drugs or alcohol or by any mental disability or illness, and that he presented himself as clear of mind. The court further found that there is nothing in the record that he has any prior criminal experience. Tullis's questioning was one event that lasted about two hours. The court found that the intensity was very low–that everyone spoke in a respectful, conversational tone, that no one raised his voice, and that no one used body language or a tone of voice that created tension or undue stress. The court also found that Tullis was not physically deprived or mistreated in any way during the questioning. We watched the entire video recording of the interview, which is in the record, and we agree with these findings.

{¶ 20}   Tullis contends that the detectives induced him to confess by promising that if he confessed, his employer would not be told. Tullis initially denied that he had done anything wrong, but later he confessed to an instance of voyeurism. Tullis says that he confessed because one of the detectives told him that "this doesn't even have to be something that the Base finds out about since it's relatively minor" and that "the Base doesn't have to get involved in all this." Later, says Tullis, when the detective confronted him with allegations of another instance of voyeurism, burglary, and rape, the detective said to him, "If I feel like you're being dishonest with me, then I gotta get a hold of the Base and stuff like that." Tullis says that the threat to contact the Base induced him to confess because he did not want the Base to find out, which

would ruin his military career. In other words, says Tullis, this threat communicated hope that if he confessed, he would receive the benefit of continuing his life and career without interruption.

{¶ 21} Tullis also contends that the detectives verbally dominated the interview. He points out that, only three minutes into the interview, they began challenging his answers. And says Tullis, they continued to repeat the same basic question for nearly 30 minutes until he told them what they wanted to hear. Whenever Tullis said that he did not look in the neighbor's windows, the detective confronted him with the statement from a witness who said that he saw Tullis do it. Tullis contends that the detectives' challenging of his responses, together with the 30 minutes of questioning about whether he peered into his neighbor's windows, effectively accused Tullis of being dishonest until he provided them with the confession. Tullis also points to the detectives' comments concerning the Base, including that they would have to report his crimes. One detective insisted on contacting Tullis's superior officer to tell him why Tullis was late to work that afternoon, despite Tullis's assurance that he would do it himself.

{¶ 22} "'The line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. * * *'" *Jackson*, 2002-Ohio-4680, at ¶ 28, quoting *People v. Flores*, 144 Cal.App.3d 459, 192 Cal.Rptr. 772 (1983). Police use of tactics like admonitions to tell the truth are not improper. *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 29; *State v. Stringham*, 2d Dist. Miami No. 2002-CA-9, 2003-Ohio-1100, at ¶ 16 (saying that "admonitions to tell the truth are considered neither threats nor promises and are permissible"). The detectives here simply urged Tullis, in a variety of ways, to tell the truth. It

was unreasonable of Tullis to infer from the detectives' statements that a confession would mean that the Base would not find out. Even someone unfamiliar with the statutory penalties for the potential offenses would realize that the matter had serious consequences. Tullis should have realized that the Base was bound to find out, in fact he said he had already sought counseling related to his tendencies that led to the offenses. Given what the evidence reveals about Tullis, we do not think that his will was overborne by the detectives' conduct and language.

{¶ 23} We see nothing unduly coercive here in the detectives' conduct or language. *Compare Stringham*, 2003-Ohio-1100, at ¶ 15 (finding defendant's arguments unpersuasive that police downplayed the seriousness of his offense, exaggerated the evidence against him, implied that he would not be prosecuted, suggested that he could work something out if he would confess, stated that he could do more for defendant than an attorney, and offered to help him in exchange for a confession). Nothing in these facts and circumstances suggests improper coercion leading to an involuntary confession. *Compare State v. Stringham*, 2003-Ohio-1100, ¶ 13 (finding "nothing coercive or overbearing about the physical circumstances of the interview," where the officers spoke in a conversational manner, the tone of the dialogue was "benign," the defendant was questioned only once for about two hours, and there was no evidence of physical deprivation or mistreatment). The trial court's conclusion is correct that Tullis's confession was voluntary.

{¶ 24} The second assignment of error is overruled.

{¶ 25} The trial court's judgment is affirmed.

. . . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur.

Copies mailed to:

Stephen K. Haller
Nathaniel R. Luken
Jay A. Adams
Hon. Stephen Wolaver