[Cite as *State v. Nichols*, 2020-Ohio-5157.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 19AP-612 |
| v. | : | (C.P.C. No. 18CR-2024) |
| Angela M. Nichols, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on November 3, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellant. **Argued:** *Seth L. Gilbert*.

**On brief:** *Yeura Venters*, Public Defender, and *George M. Schumann*, for appellee. **Argued:** *George M. Schumann*.

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Plaintiff-appellant, State of Ohio, appeals from the September 11, 2019 entry of the Franklin County Court of Common Pleas granting, in part, the motion to suppress of defendant-appellee, Angela M. Nichols. For the reasons set forth below, we reverse and remand for further proceedings.

{¶ 2} By indictment filed April 27, 2018, the state charged Nichols with one count of tampering with evidence in violation of R.C. 2931.12, a third-degree felony, and one count of abuse of a corpse in violation of R.C. 2927.01, a fifth-degree felony.[1]

---

[1] The indictment charged Nichols' husband, Andrew, with the same crimes.

{¶ 3}   Subsequently, on February 7, 2019, Nichols filed a motion to suppress statements she made to detectives during an interview at the Franklin County Sheriff's office on April 16, 2018.  Nichols argued that the interview was a "custodial interrogation" and that the statements were elicited without proper advisement of her constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  (Feb. 7, 2019 Mot. to Suppress at 2, 6.)  The state opposed the motion, arguing that Nichols was not in custody at the time of the interview; thus, no *Miranda* warnings were required.  The trial court set the matter for a hearing.

{¶ 4}   At the suppression hearing on June 27, 2019, the state provided the following evidence.  On April 16, 2018, Franklin County Sheriff Deputy James Dishong was instructed by the detective bureau to contact Nichols and her husband, Andrew, at the Days Inn on Stringtown Road to see if either or both of them would be willing to come to the sheriff's office for an interview.  Dishong did not know if Nichols was considered to be a potential suspect or a witness.  Dishong drove a marked police cruiser to the hotel.  Upon arrival at Nichols' room, he covered the door's peep hole with his hand and knocked.  When Nichols answered the door, Dishong explained that detectives would like to speak to her.  Dishong was wearing a uniform; his service weapon was visible but holstered.  According to Dishong, Nichols seemed a little surprised by his presence, as if she did not understand what was happening.  Nichols told Dishong that Andrew was not present, as he had gone to buy cigarettes.  Another deputy left to search for him.

{¶ 5}   Dishong, referring to himself as "the Uber driver," told Nichols he would give her a ride to the sheriff's office, but she did not have to go with him.  (June 27, 2019 Tr. at 7.)  According to Dishong, Nichols "was free to go, free to run away, free to close the door in my face, whatever she wanted to do."  *Id.* at 21.  When Nichols expressed concern about leaving her dog alone at the hotel for an extended period of time, Dishong explained that a hotel employee had assured another deputy that the dog could stay in the room.

{¶ 6}   Dishong testified that he explicitly told Nichols that she was not under arrest; as such, he did not handcuff or otherwise restrain her and did not advise her of her *Miranda* rights.  He denied Nichols' request to smoke a cigarette before leaving the hotel but permitted her to take her purse with her.  Dishong and Nichols engaged in small talk during the drive from the hotel to the sheriff's office, which took eight or nine minutes.  Upon

arrival, Dishong and Nichols entered through the Sallyport. Dishong escorted Nichols to an interview room in the detective bureau.

{¶ 7} Franklin County Sheriff Detectives Jason Evans and Andrew Harper interviewed Nichols in conjunction with an investigation involving discovery of an unidentified dead body in the basement of a Harrisburg home where Nichols and Andrew had recently lived with Andrew's mother. Evans testified that prior to the interview, he did not consider Nichols to be a "suspect"; rather, she was "just a witness." *Id.* at 33.

{¶ 8} At the outset of the interview,[2] Evans and Harper introduced themselves as detectives and thanked Nichols "for coming down and chatting with us." *Id.* at 37; State's Ex. M-1. When asked about her living arrangements, Nichols confirmed that she and Andrew had been staying with Andrew's mother in Harrisburg for a few weeks until the landlord asked them to leave because of their dog.

{¶ 9} Evans soon averred, "[s]o obviously you are here for a reason." *Id.* at 38; State's Ex. M-1. Nichols responded, "[y]eah, and I have no idea." *Id.*; State's Ex. M-1. Evans then said, "we will kind of fill you in, but * * * I really want you to be honest with us * * * and come clean with us, okay?" *Id.*; State's Ex. M-1. Nichols agreed to do so.

{¶ 10} The detectives then questioned Nichols about telephone communications she had with Andrew's mother earlier in the evening. Nichols acknowledged that her mother-in-law initially asked her, "[w]hy am I in a sheriff's vehicle"? *Id.* at 38; State's Ex. M-1. In a subsequent call, her mother-in-law stated, "[i]t's a crime scene. They're taping off the house." *Id.* at 39; State's Ex. M-1. Nichols told her mother-in-law that she did not know why law enforcement was at the house. Nichols apprised Andrew of the conversations; he stated that he would return his mother's call and then left the hotel. He did not return prior to Nichols' departure with Dishong.

{¶ 11} The detectives then asked Nichols about her relationship with Andrew. She averred that the 2 had been married for 5 years and have a 15-month old child. She further averred that Andrew had been a patient at a psychiatric facility in February 2019 and had been arrested for assault in October 2018.

---

[2] The interview was videotaped. The parties stipulated to a redacted version of the videotape, which was submitted as State's Ex. M-1 and played at the motion hearing. The redactions involve only gaps in time where the detectives exited and reentered the interview room. Audio from the interview was transcribed and is included in the transcript of the motion hearing.

{¶ 12} At this point in the interview, Evans left the room to take a phone call from his sergeant. Harper remained with Nichols and continued to question her about Andrew. When Evans returned, at the 7 minute, 48 second mark of the interview (hereinafter "7:48"), he told Nichols he had just been informed that a neighbor who lives behind the Harrisburg home told sheriff's deputies that Nichols had asked to borrow carpet cleaner. Nichols responded that she had used her own carpet cleaner to clean up a mess made by the dog.

{¶ 13} Evans immediately advised Nichols that the interview was being recorded. He then averred, "[y]ou got about 50 years of law enforcement sitting in front of you. This is not our first case. * * * I no doubt think that you are fully aware of what's in that basement and what took place in that basement." *Id.* at 46; State's Ex. M-1. He informed Nichols that there was a dead body in the basement of the Harrisburg home and urged her to "start thinking about who you are trying to protect here." *Id.*; State's Ex. M-1. When Nichols averred that she "had no idea" about the dead body, Evans stated, "Andrew is not here right now for us to talk to, but you are. * * * Accidents happen. * * * You were in the house as well. If you made a mistake, this is the time for us to know that up front. * * * Don't sit here and lie to me. * * * People make mistakes. * * * We know what took place. We know what happened. I need you to tell us what happened." *Id.* at 46-47; State's Ex. M-1. At the hearing on the motion to suppress, Evans acknowledged that after he returned to the interview room, he lied to Nichols about knowing what had happened to the woman in the basement. He characterized his fabrication as an "interview tactic" often used by police. *Id.* at 48.

{¶ 14} Nichols insisted that she did not know what had happened; Evans responded, "[w]ell, I think you do." *Id.* at 47; State's Ex. M-1. Both detectives then told Nichols that they knew Andrew was abusing drugs and that he had a bad temper. Evans further stated, "[n]ow, am I going to sit here and accuse you or Andrew of being homicidal maniacs? No, I'm not, and I don't think you are. I think you're good people who made a mistake and attempted to clean up the mess. * * * I've already told you, this isn't our first homicide." *Id.* at 49; State's Ex. M-1.

{¶ 15} When Nichols began discussing the carpet cleaner, Evans averred "[w]e're beyond that. All right? Don't lie to me. * * * If you made a mistake, that's what we need to

know. If Andrew made a mistake that's what we need to know. * * * Look at me. Tell me what happened in the basement." *Id.* at 49-50; State's Ex. M-1.

{¶ 16} Nichols told the detectives she had arrived at the Harrisburg home three weeks earlier following her release from a drug rehabilitation facility in California. Andrew immediately told her that a girl had "OD'd" in the basement and that her body was still there. *Id.* at 50-51; State's Ex. M-1. He further stated that the girl had injected herself with cocaine, resulting in a fatal seizure. Because he feared arrest for drug possession, he disposed of the needle the girl used and did not call 911. Nichols urged Andrew to call 911; however, neither she nor Andrew did so.

{¶ 17} After questioning Nichols about Andrew's current whereabouts and the couple's past and present drug use, Evans announced he was going to leave the interview room to make phone calls. Nichols asked if she was going to be arrested. Evans responded, "I can't say that for sure. * * * You being forthcoming with us and being honest, it goes a long way." *Id.* at 59; State's Ex. M-1. Both Evans and Harper left the room; Nichols remained alone in the room and, with Evans' permission, smoked a cigarette.

{¶ 18} When the detectives returned, Evans asked Nichols what she knew about the deceased woman. Evans said "listen, you've already came clean, so to speak, and been more than informative and been very helpful to us, to our investigation. And with that being said, there is no reason to shut down on me now." *Id.* at 61; State's Ex. M-1. Nichols averred that she did not know the woman, as Andrew had met her in the psychiatric facility. Evans then questioned Nichols about her drug supplier; Nichols provided a name and cell phone number.

{¶ 19} The detectives again returned to the topic of the deceased woman. Both expressed incredulity at Nichols' statement that she had never gone into the basement to examine the woman's body. They also questioned her about her knowledge of Andrew's clean-up efforts in the basement. To that end, Harper averred, "[y]ou have got to think about this. Now, we're going to fingerprint that plastic, we're going to swab it. * * * [Y]our fingerprints, your DNA is not going to be on that bagged body anywhere? *Id.* at 68; State's Ex. M-1. When Nichols responded, "I was never in the basement," Harper asked, "[i]t's not going to be on the floor around it where you kneeled down to help him tape her up or anything? * * * So if you were anywhere near that body, we are going to know it, and that's

where you have been great with us. But continue to be great and let us know. * * * [A]nd believe it or not, tape is an awesome thing to collect evidence. So did you help him wrap her up?" *Id.* at 68-69; State's Ex. M-1. Nichols responded, "[y]eah." *Id.* at 69; State's Ex. M-1.

{¶ 20} Evans then said, "we know this stuff" and warned Nichols not to "lie" to him. *Id.* at 69; State's Ex. M-1. Harper urged Nichols to "look out" for herself and "be honest with everything." *Id.*; State's Ex. M-1. In response to questions about her return to Harrisburg from California, Nichols reiterated what Andrew told her about the body in the basement. Nichols said she and Andrew eventually went down to the basement because they "were afraid [the body] would start smelling." *Id.* at 71; State's Ex. M-1.

{¶ 21} Harper then told Nichols to be "completely honest" and "walk us through what you guys did." *Id.* Nichols averred, "I feel like I need a lawyer. I'm scared." *Id.* Without any acknowledgment of Nichols' statement, Evans asked her to provide more details about what had happened. He also told Nichols that Andrew was in custody and would tell the police what had occurred.

{¶ 22} Evans next stated, "I understand that you assisted him in wrapping the body or placing it in a bag." *Id.* at 72. Nichols agreed and thereafter provided details of their actions. Specifically, Nichols averred that while wearing gloves, they taped together six plastic trash bags, placed the woman's fully clothed body on top of the trash bags, and duct-taped around it. Following additional questioning about her drug use with Andrew, the detectives left the room.

{¶ 23} Upon their return, the detectives told Nichols they had spoken with Andrew that morning and now had to "nail down some details with you." *Id.* at 75; State's Ex. M-1. Evans clarified that Nichols was not being accused of administering the lethal dose of drugs to the woman or even being present when the woman did so. Thereafter, Harper averred, "I've got to get through this with you real quick, okay" and advised Nichols of her *Miranda* rights. *Id.* at 76; State's Ex. M-1. Nichols indicated that she understood her rights.

{¶ 24} Thereafter, in response to the detectives' further questioning, Nichols repeated, albeit in slightly greater detail, the information she had already disclosed regarding her discussion with Andrew about the circumstances of the woman's death and

her participation in wrapping the body and cleaning the area around it. Subsequently, the detectives swabbed Nichols' mouth for DNA and ended the interview.

{¶ 25} In addition to State's Ex. M-1, the state submitted State's Ex. M-2, a constitutional rights form used by the sheriff's office in advising an accused of his or her *Miranda* rights. At the hearing, Evans acknowledged that Nichols did not sign the form. He explained that pursuant to standard sheriff's office protocol, Nichols was not given the opportunity to do so because she had orally waived her rights during the recorded interview.

{¶ 26} On cross-examination, Evans conceded that at no time during Nichols' interview did he tell her that the interview was voluntary, that she was free to leave, or that she did not have to speak with him. He further acknowledged that Nichols was seated at a table at the back of the interview room and that he and Harper sat facing her on either side of the table; he was seated between Nichols and the door. In addition, he admitted that Nichols was not permitted to leave the room to smoke. Review of State's Ex. M-1 bears out these details. Evans testified that the seating arrangement was to accommodate the video camera. He conceded that Nichols "probably" was "under the impression that she had to stay in the room" during the interview. *Id.* at 134.

{¶ 27} In response to defense counsel's intimation that Evans considered Nichols to be a suspect from the outset of the interview based upon his knowledge that a dead body had been discovered in the basement of the home where Nichols was staying, Evans averred that he "thought of her as nothing more than a witness until the time we Mirandized her." *Id.* at 106. During further cross-examination, however, Evans acknowledged that many of the questions posed to Nichols prior to advisement of her *Miranda* rights were designed to, and did, elicit incriminating responses from her. He also acknowledged that the questions posed after the *Miranda* advisement elicited only "more detail" about the topics already covered prior to the advisement. *Id.* at 132. He further testified that at the conclusion of the interview and after discussion with other law enforcement personnel, it was determined there was probable cause to take Nichols into custody; she was thereafter taken directly to jail.

{¶ 28} Nichols testified that she was in bed when the police knocked on her hotel room door. She stepped outside and was told she "needed to go down and speak to a

detective downtown." *Id.* at 146. She felt she did not have a choice in the matter. A deputy accompanied her into the room to retrieve her sneakers. She was not provided the opportunity to make arrangements for the care of her dog. Dishong granted her permission to smoke before he "hurried" her into his police cruiser. *Id.* at 148.

{¶ 29} Upon arrival at the sheriff's office, she was escorted into an interview room; the door was closed behind her. She believed she would have been handcuffed and "taken in anyway" had she refused to go into the room. *Id.* at 150. She did not feel as if she could leave the room without asking permission to do so or that she had a choice about answering the detectives' questions. She was not asked if she wanted to talk to the detectives and was not told that she was not required to speak to them. She further testified that she did not have a means of returning to the hotel.

{¶ 30} Nichols conceded on cross-examination that the detectives were "nice" to her and did not shout at her. *Id.* at 155. She further acknowledged that they repeatedly told her they wanted to help her and encouraged her to "look out" for herself." *Id.*

{¶ 31} Following the evidentiary hearing, the trial court accepted additional briefing from the parties on the issues raised at the hearing. In her briefing, Nichols argued that the entire interview was a custodial interrogation and that all of her statements—both before and after the *Miranda* warnings—should be suppressed. Nichols further maintained that even if the interview began as a voluntary interview, it became custodial once Evans returned to the interview room at the 7:48 mark as, at that point, the nature of the questioning changed. In contrast, the state argued that no *Miranda* warnings were required because Nichols was never in custody and, even though unnecessary, the *Miranda* warnings given were effective.

{¶ 32} At the August 13, 2019 hearing addressing the parties' additional briefing, the court issued an oral ruling granting Nichols' motion to suppress in part. The court, noting that it had reviewed State's Ex. M-1, suppressed all of Nichols' statements made after the 7:48 mark in the interview. The court reasoned that, prior to that point, "there was no indication and no interviewing of her culpability and/or knowledge of the event." (Aug. 13, 2019 Tr. at 165.) The court further determined after the 7:48 mark, "the detectives directly confronted Ms. Nichols about her knowledge and participation in the location of the body and the ultimate bundling of the body, and the detectives failed to provide Ms. Nichols with

the appropriate and proper Miranda warnings." *Id.* at 165-66. The court noted that Nichols was in a "closed interview room, and it was a clear inquiry into her without the reading of the *Miranda* warnings." *Id.* at 166. The court further averred that any subsequent advisement of her *Miranda* rights "does not render the admission of the statements." *Id.* at 166.

{¶ 33} The trial court journalized its oral ruling in an entry filed September 11, 2019 wherein the court stated:

> Upon reviewing the videotape and the post-hearing memorandums [sic] the Court found [at the August 13, 2019 hearing] that at 7:48 of the videotaped interview with Angela Nichols, the detectives began to inquire into Ms. Nichol's [sic] knowledge of the event. However, prior to that time there was no indication and no interviewing of her culpability and or [sic] knowledge of the event. Therefore; [sic] the first 7:48 seconds [sic] will be admitted. The court also found that from 7:48 to the remainder of the videotaped interview, the detectives conducted a custodial interrogation of the Defendant without first advising the Defendant of her Constitutional Miranda Rights. The Detectives directly confronted Ms. Nichols about her knowledge and participation in the location of the body in a closed interview room until the Defendant's inculpatory statements were solicited. Therefore, the Court will suppress the remainder of the video.

(Sept. 11, 2019 Entry at 2.)

{¶ 34} The state timely appeals pursuant to Crim.R. 12(K) and R.C. 2945.67(A) and sets forth one assignment of error for our review:

> The trial court committed reversible error in suppressing statements.

{¶ 35} In its single assignment of error, the state argues that the trial court erred in concluding that statements made by Nichols after the 7:48 mark in the interview were the result of custodial interrogation requiring *Miranda* warnings. The state concedes that the detectives' interview of Nichols was an interrogation. The relevant issue, therefore, is whether Nichols was in custody at the time she was interrogated. The state maintains that Nichols was never in custody; Nichols contends she was in custody from the time she was first contacted by Dishong at the hotel.

{¶ 36} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 (4th Dist.1997). Therefore, an appellate court grants deference to the trial court's findings of fact but conducts a de novo review of whether the trial court applied the appropriate legal standard to those facts. *State v. Soto*, 9th Dist. No. 16CA011024, 2017-Ohio-4348, ¶ 5, citing *State v. Booth*, 151 Ohio App,3d 635, 2003-Ohio-829, ¶ 12 (9th Dist.).

{¶ 37} The Fifth Amendment to the United States Constitution, applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides persons with a privilege against self-incrimination. *State v. Wilcox*, 10th Dist. No. 05AP-972, 2006-Ohio-6777, ¶ 43. The privilege against self-incrimination is also guaranteed by Section 10, Article 1 of the Ohio Constitution, which provides that "[n]o person shall be compelled, in any criminal case, to be a witness against himself." *Id.* To protect this right, a criminal defendant subject to custodial interrogation by law enforcement must be informed of his or her constitutional rights to remain silent and to have defense counsel. *Miranda*, 384 U.S. at 478-79.

{¶ 38} The *Miranda* court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. "A person is considered in custody for purposes of *Miranda* when he is placed under formal arrest or his freedom of action is restrained to a degree associated with a formal arrest." *State v. Simpson*, 10th Dist. No. 01AP-757, 2002-Ohio-3717, ¶ 33, citing *Minnesota v. Murphy*, 465 U.S. 420, 434 (1984). "In determining whether a person's freedom of movement was so restrained, what is examined is not the subjective views of the person or of the authorities

but the 'objective circumstances' of the questioning." *State v. Tullis*, 2d Dist. No. 2012-CA-59, 2013-Ohio-3051, ¶ 9, citing *Stansbury v. California*, 511 U.S. 318, 323 (1994). The test is "whether, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.' " *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995), quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion).

{¶ 39} In *State v. Simms*, 10th Dist. No. 10AP-1063, 2012-Ohio-2321, this court noted the decision of the Second District Court of Appeals in *State v. Estepp*, 2d Dist. No. 16279 (Nov. 26, 1997), which set forth several factors to consider in assessing how an objectively reasonable person would have understood and interpreted the interrogation. *Simms* at ¶ 55. Those factors include: (1) the location of the interrogation, i.e., whether the defendant was comfortable and in a place a person would normally feel free to leave; (2) whether the defendant was a suspect at the time the interrogation began; (3) whether the defendant's freedom to leave was restricted in any way; (4) whether the defendant was handcuffed or informed he or she was under arrest; (5) whether the defendant was threatened during the interrogation; (6) whether the defendant was physically intimidated during the interrogation; (7) whether the police verbally dominated the interrogation; (8) the defendant's purpose for being at the place where the interrogation occurred; (9) whether neutral parties were present at any point during the interrogation; and (10) whether the police took any action to overpower, trick, or coerce the defendant into making a statement. *Id.*, citing *Estepp.* Other appellate districts have applied the *Estepp* factors in determining the issue of custody. *See State v. Carter*, 3d Dist. No. 1-10-01, 2010-Ohio-5189, ¶ 23; *State v. Jones*, 5th Dist. No. 13 COA 012, 2014-Ohio-1716, ¶ 31-40; *State v. Benson*, 11th Dist. No. 2018-A-0054, 2019-Ohio-3234, ¶ 40-49; *State v. Tate*, 7th Dist. No. 07 MA 130, 2008-Ohio-3245, ¶ 46-68.

{¶ 40} In addition to the factors set forth in *Estepp*, Ohio courts have also considered: (1) the duration of the interrogation; (2) whether the defendant was released or arrested at the conclusion of the interrogation; (3) whether the door to the interrogation room was closed or open, locked or unlocked; (4) whether the defendant requested to leave the interrogation room; (5) whether law enforcement told the defendant he or she was free to leave or gave the impression he or she was not free to leave; (6) the positioning of the defendant and law enforcement in the interrogation room; (7) the circumstances under

which the defendant appeared at the interrogation (voluntarily or involuntarily); and (8) whether the defendant was transported to the police station by a police officer. *See State v. Brantley*, 9th Dist. No. 27466, 2016-Ohio-4680, ¶ 53, 60-62; *State v. Tullis*, 2d Dist. No. 2012-CA-59, 2013-Ohio-3051, ¶ 10; *State v. Gomez*, 12th Dist. No. CA2017-03-035, 2017-Ohio-8681, ¶ 21; *State v. Smith*, 12th Dist. No. CA2006-08-030, ¶ 12 (Jan. 20, 2009). In addition, an officer's statements concerning the nature of the investigation or his or her beliefs regarding the culpability of the defendant are also relevant in assessing whether the defendant was in custody when such statements would have affected how a reasonable person in the defendant's position would perceive his or her freedom to leave. *State v. Greeno*, 3d Dist. No. 13-02-46, 2003-Ohio-3687, ¶ 17, citing *Stansbury v. California*, 511 U.S. 318, 324-25 (1994); *State v. Robinson*, 6th Dist. No. L-06-1182, 2008-Ohio-3498, ¶ 271.

**{¶ 41}** When the record contains evidence of the foregoing factors, the factors must be examined to determine " 'whether, under the totality of the circumstances a reasonable person would have believed that he was not free to leave.' " *Soto*, 9th Dist. No. 16CA011024, 2017-Ohio-4348, at ¶ 11, quoting *State v. Dunn*, 9th Dist. No. 04CA008549, 2005-Ohio-1270, ¶ 24.

**{¶ 42}** In neither its oral ruling nor its written entry did the trial court specifically find at what point Nichols was in custody. Although a reasonable interpretation of the trial court's written statement that "from 7:48 to the remainder of the videotaped interview, the detectives conducted a custodial interrogation of the Defendant" suggests that the court found that Nichols was not in custody prior to the 7:48 mark in the interview, the trial court did not expressly so state. Furthermore, the court's statement is ambiguous as to whether the reference to "custodial interrogation" related to interrogation, custody, or both.

**{¶ 43}** Further, in both its oral ruling and written entry, the trial court made only two factual findings in support of its decision to suppress the statements Nichols made after the 7:48 mark in the interview–that the detectives "directly confronted Ms. Nichols about her knowledge and participation in the location of the body"–and that the interview was conducted in a "closed interview room." (Aug. 13, 2019 Tr. at 165-66; Sept. 11, 2019 Entry at 1-2.) However, the evidence presented at the suppression hearing, which included the videotaped interview, the testimony provided by the state's witnesses, Dishong and Evans,

and the testimony offered by Nichols, includes numerous additional facts relevant to an assessment of how an objectively reasonable person in Nichols' position would have understood and interpreted her circumstances.

{¶ 44} Further, the trial court's findings of fact contained no analysis or discussion of the testimony provided by Dishong, Evans, or Nichols. Although the trial acknowledged in its entry that Dishong and Evans testified on behalf of the state, the court averred that "[t]he Defendant called no witnesses." (Entry at 1.) This statement is contrary to the record.

{¶ 45} Whether a defendant has been subjected to custodial interrogation for purposes of the Fifth Amendment and *Miranda* is a fact-intensive inquiry. *State v. Martucci*, 9th Dist. No. 28888, 2018-Ohio-3471, ¶ 10, citing *State v. Lerch*, 9th Dist. No. 26684, 2013-Ohio-5305, ¶ 8; *Benson*, 11th Dist. No. 2018-A-0054, 2019-Ohio-3234, at ¶ 38. As noted, in reviewing a trial court's suppression ruling, we must accept the trial court's factual findings if they are supported by competent, credible evidence. *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8. "However, a trial court's findings of fact are deemed incomplete when they fail to include pertinent facts that were presented during the hearing and which are necessary to conduct the legal analysis." *Soto*, 9th Dist. No. 16CA011024, 2017-Ohio-4348, ¶ 10, citing *State v. Trivett*, 9th Dist. No. 15CA0041-M, 2016-Ohio-8204, ¶ 7-8. In addition, "the findings of fact are incomplete when the trial court fails to evaluate the credibility of witnesses and resolves questions of fact." *Id.*, citing *State v. Martin*, 9th Dist. No. 24812, 2009-Ohio-6948, ¶ 14. A reviewing court "has a limited standard of review as to the facts and is not permitted to fill-in gaps." *Id.* at ¶ 10. The absence of adequate factual findings impedes a reviewing court's ability to determine the extent to which the facts in the record were considered by the trial court. *Martucci* at ¶ 9, quoting *State v. Purefoy*, 9th Dist. No. 27992, 2017-Ohio-79, ¶ 18. In such an instance, a reviewing court must reverse a trial court's suppression ruling and remand the matter for the trial court to make factual findings in the first instance. *Id.*, citing *Purefoy; Soto* at ¶ 17-18.

{¶ 46} In the present case, because the trial court has failed to adequately set forth its findings of fact, including an evaluation of the credibility of all witness who testified at the suppression hearing, this court cannot properly apply the *Burnside* directive that we

determine, without deference to the trial court, whether the facts satisfy the applicable legal standard. "[B]ecause [the trial court's findings of fact] are incomplete, we cannot conclude that [its] findings of facts as a whole are supported by competent, credible evidence." *Trivett*, 9th Dist. No. 15CA0041-M, 2016-Ohio-8204, at ¶ 7. Consequently, we must conclude that the trial court erred by granting the motion to suppress upon the analysis set forth in its September 11, 2019 entry. Accordingly, the state's sole assignment of error is sustained, and the matter is remanded to the trial court to make adequate factual findings, including credibility determinations, and address the motion to suppress based upon those findings in the first instance.

{¶ 47} Having sustained the state's sole assignment of error, we hereby reverse the judgment of the Franklin County Court of Common Pleas and remand this matter to the trial court for further proceedings in accordance with law and consistent with this decision.

*Judgment reversed; cause remanded.*

BEATTY BLUNT and NELSON, JJ., concur.