# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: K.J. | : | APPEAL NOS. | C-250488 |
| | | | C-250489 |
| | : | | C-250490 |
| | | | C-250491 |
| | : | TRIAL NOS. | 24/1906-02 X |
| | | | 24/1906-03 X |
| | : | | 24/1906-08 X |
| | | | T/24/1161-02 X |
| | : | | |
| | : | | |
| | | *JUDGMENT ENTRY* | |
| | : | | |

This cause was heard upon the appeals, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgments of the trial court are reversed and the cause is remanded.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 6/10/2026 per order of the court.**


**By:**_____
     **Administrative Judge**

[Cite as *In re K.J.*, 2026-Ohio-2169.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: K.J. | : | APPEAL NOS. | C-250488 |
| | | | C-250489 |
| | : | | C-250490 |
| | | | C-250491 |
| | : | TRIAL NOS. | 24/1906-02 X |
| | | | 24/1906-03 X |
| | : | | 24/1906-08 X |
| | | | T/24/1161-02 X |
| | : | | |
| | : | | |
| | : | *O P I N I O N* | |

Appeals From: Hamilton County Juvenile Court

Judgments Appealed From Are: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: June 10, 2026

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Norbert Wessels,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Margaret Kane*, Assistant Public Defender, for Defendant-Appellant.

**KINSLEY, Presiding Judge.**

{¶1} K.J. appeals his delinquency adjudications in the Hamilton County Juvenile Court for obstructing official business, carrying a concealed weapon, and tampering with evidence, and his adjudication as a juvenile traffic offender for committing a pedestrian violation ("jaywalking"). K.J. argues that the trial court erred in failing to suppress evidence obtained after he ran from what he contends was an unreasonable police encounter. He also contests the sufficiency of the evidence supporting his adjudications for carrying a concealed deadly weapon, tampering with evidence, and obstructing official business and argues that his adjudication for jaywalking was against the manifest weight of the evidence.

{¶2} We agree with K.J. that the trial court failed to consider the legality of the initial police encounter in denying his motion to suppress. As we explain in this opinion, the question of whether the police had reasonable suspicion to stop K.J. could only be resolved by determining whether the officer's testimony that K.J. jaywalked was credible. Because the credibility of witnesses is a matter for the juvenile court to resolve in the first instance, we remand the matter so the court below can resolve that foundational issue.

{¶3} This disposition renders moot the question of whether K.J.'s jaywalking adjudication was against the manifest weight of the evidence. It does not, however, resolve K.J.'s sufficiency challenge, as the State could not proceed with a new adjudication hearing on remand in the absence of sufficient evidence. Considering the evidence presented below in the light most favorable to the State, we hold there was sufficient evidence to support K.J.'s delinquency adjudications for obstruction of official business, carrying a concealed weapon, and tampering with evidence.

*Background*

{¶4}    On September 11, 2024, the State filed delinquency complaints against K.J., which alleged that he committed acts that, had they been committed by an adult, would have constituted (1) carrying a concealed weapon, in violation of R.C. 2923.12, a third-degree felony; (2) tampering with evidence, in violation of R.C. 2921.12(A)(1), also a third-degree felony; and (3) obstructing official business, in violation of R.C. 2921.31, a second-degree misdemeanor.[1]   The State also cited K.J. for a jaywalking violation under Cincinnati Municipal Code ("CMC") 506.46.   The initial jaywalking citation was filed on September 11, 2024, but the State dismissed it and refiled the citation on December 19, 2024.

{¶5}    Taken together, the complaints alleged that K.J. jaywalked outside of a marked crosswalk, then ran from police who attempted to investigate.   When the police searched an apartment K.J. entered after he fled, they found a firearm hidden in a closet.   The State charged K.J. with concealing the weapon on his person, then tampering with it to prevent the police from finding it.   K.J.was arrested and taken into custody after he came out of the apartment.

{¶6}    On January 7, 2025, K.J. filed a motion to suppress evidence arguing that the police lacked both reasonable suspicion for the initial stop and probable cause for the arrest.   The juvenile court conducted an evidentiary hearing on K.J.'s motion, at which three witnesses testified: Sergeant James Davis, Officer Zachary Kress, and Officer Cameron Fehrman, all from the Cincinnati Police Department ("CPD").

{¶7}    Davis, who had been with CPD for 27 years, testified that he was assigned to the Crime Gun Intelligence Unit ("CGIU"), where he had worked since

---

[1] K.J. was also charged with burglary and receiving stolen property, but these charges were dismissed.

2018. Davis explained that on September 11, 2024, his unit was conducting surveillance in the Village of Roll Hill by the Fay Apartments, a neighborhood he described as a "high crime area." Davis was in plain clothes, but was supported by uniformed officers. Davis observed from his car, which was parked on President Drive. From that vantage point, Davis saw K.J., who was wearing a crossbody bag, and two other young men cross from Baltimore to President Drive without using either of the two crosswalks that were available at the intersection. Davis testified that he radioed ahead to another officer who was closer to the boys' location to report what he had seen.

{¶8} Davis was cross-examined about a possible discrepancy between CPD's investigation report of the incident and the jaywalking citations the State filed against K.J. When shown the documents, Davis acknowledged that the investigation report indicated that the location of the offense was 3732 President Drive, but the original jaywalking citation alleged that the offense occurred at 3700 President Drive. The refiled citation contained yet another address—3601 President Drive. Davis admitted that none of these addresses matched the location where he saw the boys jaywalk. But Davis also explained that he did not create the investigation report or either of the citations and that he was unaware that the State had dismissed and refiled the jaywalking citation. Davis further pointed out that the incident occurred in several locations—including where K.J. jaywalked and the apartment K.J. entered—but the investigation report and citation forms leave space to enter only one address.

{¶9} Kress, who had been with CPD for eight years and had been assigned to the CGIU since 2021, testified that he went to the Village of Roll Hill apartments on

September 11, 2024 to follow up on ShotSpotter alerts.[2]  As he conducted surveillance in an unmarked car near 3708 or 3710 President Drive, Kress heard Davis say over the radio that he saw three individuals commit a jaywalking violation.  Davis further reported the direction the suspected jaywalkers were headed.  Soon thereafter, the boys walked past Kress's car.  When they did, Kress observed one of the young men, C.H., with his "arm pinned against his hip" with "no arm swing," while his other arm was swinging normally.  Kress said this could be indicative of holding a firearm to prevent it from falling.  Kress also noticed that K.J. was wearing a crossbody bag, which he said could be used to carry a firearm.

{¶10}  After seeing K.J. and the others, Kress told uniformed officers by radio to conduct an investigative stop for the jaywalking violations.  He watched as the officers approached the boys.  The boys immediately started running.

{¶11}  Fehrman, a CPD officer, testified that he was working in uniform on September 11, 2024 when he received a dispatch from Kress to stop the boys regarding the jaywalking incident.  Kress further relayed that C.H. was holding onto his waist and that K.J. had a crossbody bag.  Fehrman testified that over his years on the force, he has found multiple firearms and drugs in crossbody bags.

{¶12}  In a police cruiser, Fehrman approached the boys from behind, got out, and attempted to stop them to discuss the jaywalking.  According to Fehrman, when K.J. and C.H. saw him, they began running, which prevented him from fully conducting the stop.  Fehrman told them to stop, threatened to tase them, and chased them to a building where K.J. went into the back door of an apartment.  At that point, Fehrman left K.J. and continued chasing C.H.

---

[2] ShotSpotter is a technological system that alerts police to gunshots in real time. *State v. Edmonds*, 2020-Ohio-1148, ¶ 5, fn. 1 (7th Dist.).

{¶13} Following the hearing, the juvenile court denied K.J.'s suppression motion. Ignoring the basis for the initial stop, it held that officers had probable cause to arrest K.J. for obstruction of official business because he ran from the police. In doing so, it found that

> This is not a *Terry* stop. This is a probable cause stop for an obstruction of official business. . . . In this case, before being able to be stopped for what might have been an illegal *Terry* respond or might not have been an illegal Terry respond, two of the three took off running. . . . So the Court is making a delineation between a *Terry* stop and a reasonable suspicion and probable cause caused by further running by a kid or kids when they saw a police officer, which Ohio Supreme Court law supports.

{¶14} On June 16, 2025, the juvenile court conducted an adjudication hearing. Davis and Fehrman both testified as they did at the suppression hearing. Ferhman also testified about the results of a search of the apartment after K.J. was in custody. Fehrman found a loaded gun in a lunch box which was hidden on the floor of a utility closet. Police also found the crossbody bag which K.J. had been wearing on a bed in the apartment. While marijuana was near the bag on the bed, Fehrman never saw what, if anything, was inside of the bag.

{¶15} Officer Chris Vogelpohl, a CPD officer assigned to the CGIU, testified that he collected the gun from the apartment on September 11, 2024. It was loaded with nine bullets, one of which was in the chamber. Vogelpohl test-fired the gun twice, confirming its operability. He also swabbed the gun for DNA.

{¶16} Kress testified that he waited with other officers for about 20 or 30 minutes before K.J. exited the apartment. Kress saw the gun when it was hidden inside the closet but never saw the contents of K.J.'s crossbody bag. He also collected K.J.'s

DNA.

**{¶17}** Officer Nick Clark of CPD questioned K.J. at the police department after he was arrested. K.J. said that on September 11, 2024, he spent the day with his girlfriend at The Fay and met up with a friend.[3] K.J. admitted that a person who lives at The Fay gave him the gun. When asked where he hid the gun, K.J. said he did not remember.

**{¶18}** On cross-examination, Clark acknowledged that offense addresses on the investigation report and both jaywalking citations were inconsistent. He explained the inconsistency by noting that the offenses occurred in several different locations. Although Clark filled out part of the citation, he admitted that he did not personally observe K.J. jaywalking.

**{¶19}** After the adjudication hearing, the juvenile court adjudicated K.J. delinquent of obstructing official business, carrying a concealed deadly weapon, and tampering with evidence, and adjudged him to be a juvenile traffic offender for the jaywalking offense. The juvenile court continued the matter for disposition.

**{¶20}** At the disposition hearing, the juvenile court ordered K.J. to be committed to the permanent custody of the Ohio Department of Youth Services until he is 21 years old for carrying a concealed weapon and tampering with evidence. It suspended the commitment on the condition that K.J. engage in treatment and complete the recommendations of his probation officer. As its disposition for the obstructing adjudication, it ordered K.J. to stay away from 2204 Williamsburg Drive until August 15, 2029. As to the obstructing and jaywalking adjudications, the juvenile court also remitted court costs due to K.J.'s indigence.

---

[3] Clark described this as "the other person who ran from us," who is C.H., K.J.'s codefendant.

**{¶21}** K.J. has appealed.

## *Analysis*

**{¶22}** In two assignments of error, K.J. argues that the trial court erred in denying his motion to suppress, contests the sufficiency of the evidence supporting his delinquency adjudications for carrying a concealed weapon, tampering with evidence, and obstructing official business, and contends that his juvenile traffic offender adjudication for jaywalking was against the manifest weight of the evidence.

### A. *Motion to Suppress*

**{¶23}** K.J.'s first assignment of error challenges the trial court's denial of his suppression motion.

**{¶24}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Thyot*, 2018-Ohio-644, ¶ 17 (1st Dist.). "Questions of law are reviewed de novo without deference to the lower court's legal conclusions." *State v. Harrison*, 2021-Ohio-4465, ¶ 11, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). However, "[w]e must accept the trial court's factual findings if they are supported by competent and credible evidence." *State v. McConico*, 2024-Ohio-5657, ¶ 12 (1st Dist.). Even under this deferential standard, a trial court's findings of fact are incomplete when they fail to address pertinent facts presented at the suppression hearing that are necessary to conduct the proper legal analysis. *State v. Camper*, 2023-Ohio-4673, ¶ 39 (10th Dist.). Where a trial court fails to make the necessary factual findings, "a reviewing court must reverse a trial court's suppression ruling and remand the matter for the trial court to make factual findings in the first instance." *State v. Nichols*, 2020-Ohio-5157, ¶ 45 (10th Dist.).

**{¶25}** The juvenile court denied K.J.'s motion to suppress on the basis that K.J. ran from Fehrman when he approached K.J. and his friends to investigate their

suspected jaywalking. More specifically, the juvenile court concluded that officers had probable cause to arrest K.J. for obstructing official business on the basis that he ran away from the police investigation. This is a legal conclusion that we review de novo. *See Harrison* at ¶ 11.

**{¶26}** It is true that, as a matter of law, running from a lawful investigatory stop constitutes obstruction. *See In re M.D.*, 2023-Ohio-845, ¶ 28 (1st Dist.). Thus, officers have probable cause to arrest a fleeing suspect for obstructing official business if their initial investigatory stop is itself lawful. *Id.* at ¶ 38.

**{¶27}** An investigatory *Terry* stop must be supported by "reasonable suspicion based on specific and articulable facts that criminal behavior has occurred or is imminent." *In re J.T.*, 2023-Ohio-2695, ¶ 15 (1st Dist.). Courts evaluate whether an officer had reasonable suspicion based on the totality of the circumstances known to the officer at the time of the stop. *State v. Hairston*, 2019-Ohio-1622, ¶ 10. One such source of information can be a tip provided by a fellow officer. *State v. Rogers*, 2022-Ohio-4535, ¶ 28 (1st Dist.). Where a responding officer's suspicion is based on information provided by a fellow officer, courts must then examine whether the fellow officer had reasonable suspicion to determine if the *Terry* stop was lawful. *See, e.g., In re T.B.*, 2026-Ohio-1309, ¶ 30 (1st Dist.). Where the fellow officer lacks such suspicion, the responding officer's stop is unlawful. *See, e.g., In re M.P.*, 2014-Ohio-2846, ¶ 10-11 (1st Dist.).

**{¶28}** In denying K.J.'s motion to suppress, the juvenile court never considered whether Fehrman acted with reasonable suspicion to conduct a *Terry* stop. In fact, it specifically noted that K.J. was "stopped for what might have been an illegal *Terry* respond or might not have been," leaving open the possibility that Ferhman lacked reasonable suspicion to investigate further.

**{¶29}** Based on the testimony presented at the suppression hearing, Fehrman did not make any independent observations of K.J. that contributed to his decision to conduct a *Terry* stop. Rather, Fehrman was acting on information provided by Kress, who forwarded information provided by Davis. Thus, we consider the application of the fellow officer rule, which requires that the information supplied by Kress and Davis be supported by reasonable suspicion. *In re T.B.* at ¶ 30.

**{¶30}** As to the first-hand observations provided by Kress—that K.J. was wearing a crossbody bag of the type known to carry firearms—the State concedes that this alone is not enough to rise to the level of reasonable suspicion. We agree. Merely carrying a generic type of bag, without more, is insufficient to justify a *Terry* stop. *See, e.g., In re J.T.*, 2023-Ohio-2695, at ¶ 30 (1st Dist.) (finding reasonable suspicion lacking based on a general description of suspect's clothing). Thus, Fehrman could not stop K.J. merely based on what he learned from Kress's personal observations.

**{¶31}** As to the information provided by Davis, K.J. contends it is not credible. On this point, the parties see Davis's credibility differently. K.J. argues that Davis was an unreliable witness because the location where he testified that the jaywalking occurred did not match the offense address in the investigation report and both of the jaywalking citations. The State, however, points to Davis's explanations for these discrepancies to bolster his veracity. At the suppression hearing, Davis testified that he was not the officer who completed the paperwork, so he was not responsible for the address information. And he explained that the offenses—which included not only jaywalking, but also obstruction and tampering—occurred in a variety of locations that day.

**{¶32}** "[T]he credibility of witnesses during a motion to suppress evidence hearing is a matter for the trial court." *State v. Tarlton*, 2002-Ohio-5795, ¶ 9 (4th

11

Dist.). Here, not only did the juvenile court leave unanswered the legal question of whether Fehrman acted with reasonable suspicion in conducting a *Terry* stop, but, in resolving K.J.'s motion to suppress, it also failed to make the necessary factual findings as to whether Davis testified credibly at the suppression hearing.[4] As the issue of reasonable suspicion turns on Davis's testimony, those findings are critical to the resolution of K.J.'s motion. We cannot review the juvenile court's judgment denying K.J.'s motion to suppress without them. *See Nichols*, 2020-Ohio-5157, at ¶ 45 (10th Dist.).

{¶33} We accordingly reverse the juvenile court's denial of K.J.'s motion to suppress. The juvenile court did not resolve the foundational legal question of whether the investigatory stop was lawful and did not determine whether Davis provided credible information to support Fehrman's reasonable suspicion. We remand the matter to the juvenile court to resolve these outstanding legal and factual questions.

{¶34} K.J.'s first assignment of error is sustained.

### B. *Manifest Weight and Sufficiency of the Evidence*

{¶35} In his second assignment of error, K.J. challenges the sufficiency of the evidence supporting his delinquency adjudications for carrying a concealed deadly weapon, tampering with evidence, and obstructing official business, and argues that his juvenile traffic offender adjudication for jaywalking was against the manifest weight of the evidence.

{¶36} In resolving K.J.'s first assignment of error, we reversed the juvenile court's judgment and remanded the matter for the lower court to resolve questions as

---

[4] In reaching this conclusion, we only consider the evidence available to the juvenile court at the suppression hearing. Evidence presented at the adjudication hearing has no relevance to its determination of the suppression motion. *See State v. Turner*, 2018-Ohio-3898, ¶ 11 (9th Dist.).

to his motion to suppress. This disposition would ordinarily render moot any remaining assignments of error. *See State v. Gideon*, 2020-Ohio-6961, ¶ 26 ("[A]n assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court."). And it does make moot his manifest weight challenge to his jaywalking adjudication, which we decline to consider. *See, e.g., State v. Robinson*, 2018-Ohio-4433, ¶ 5 (1st Dist.) (finding manifest weight challenge moot by disposition of another assignment of error).

**{¶37}** But an assignment of error challenging the sufficiency of the evidence cannot be moot when an appeals court remands the case in disposing of another assignment of error, because a sufficiency challenge is potentially dispositive of a defendant's conviction. *Gideon* at ¶ 2. Thus, we consider whether sufficient evidence supported K.J.'s delinquency adjudications.

**{¶38}** To assess whether a conviction is supported by sufficient evidence, we ask "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "Where reasonable minds can reach different conclusions upon conflicting evidence, determination as to what occurred is a question for the trier of fact. It is not the function of an appellate court to substitute its judgment for that of the factfinder." *State v. Gurung*, 2024-Ohio-3202, ¶ 19 (1st Dist.).

### 1. Carrying a Concealed Weapon

**{¶39}** With regard to his adjudication for carrying a concealed weapon, K.J. argues that the State presented insufficient evidence that he had a firearm on his person or ready at hand.

**{¶40}** R.C. 2923.12(A)(2) makes it a crime to "knowingly carry or have,

concealed on the person's person or concealed ready at hand" a handgun. "A gun is 'concealed' as that term is used in R.C. 2923.12 if it is so situated not to be discernible by ordinary observation by those near enough to see it if it were not concealed." (Cleaned up.) *State v. McGee*, 2016-Ohio-7510, ¶ 26 (1st Dist.), quoting *State v. Davis*, 15 Ohio App.3d 64, 64-65 (1st Dist. 1984). "And a weapon is 'ready at hand' when it is so near as to be conveniently accessible and within immediate physical reach." (Cleaned up.) *In re K.M.*, 2015-Ohio-4241, ¶ 19 (1st Dist.), quoting *State v. Davis*, 2007-Ohio-5025, ¶ 29.

**{¶41}** The State did not present direct evidence that K.J. had a firearm concealed on his person and ready at hand. But "[a] defendant may be convicted based on circumstantial evidence [which is] equally as probative as direct evidence." (Cleaned up.) *State v. Dixon*, 2024-Ohio-5078, ¶ 14 (1st Dist.), quoting *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988).

**{¶42}** This is admittedly a close case. Taking the evidence in the light most favorable to the State, as we are required to do, a reasonable factfinder could conclude that the gun in the closet had been in K.J.'s crossbody bag when he ran from police. Several officers testified that K.J.'s bag was of the variety used to conceal firearms. K.J. ran from police when they approached, from which guilt can be inferred. *See State v. Robinson*, 2007-Ohio-2388, ¶ 19 (1st Dist.). When police searched the apartment, the bag was on a bed, and the gun was hidden in a closet. After his arrest, K.J. admitted that he had been in possession of a black gun, which someone at the Fay gave him. When asked where he hid "*that* gun *today*," K.J. did not deny hiding it. Instead, he said he did not remember.

**{¶43}** Taken together, these facts imply that K.J. possessed the gun in the crossbody bag and then hid it in the apartment closet, thus satisfying the concealment

element of the carrying a concealed weapon statute. *See In re K.M.*, 2015-Ohio-4241 at ¶ 19 (1st Dist.). Sufficient evidence therefore supported K.J.'s adjudication for carrying a concealed weapon.

### 2. *Tampering with Evidence*

{¶44} K.J. next challenges the evidence in support of his tampering with evidence adjudication. He argues that the State presented insufficient evidence that he tampered with evidence knowing that it was related to an ongoing or likely investigation.

{¶45} R.C. 2921.12 defines the offense of tampering with evidence: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall . . . alter, destroy, conceal, or remove any record, document, or thing, with the purpose to impair its value or availability as evidence in such proceeding or investigation." To prove tampering, the State must prove three elements: (1) the knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction, concealment, or removal of the potential evidence, and (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation. *State v. Straley*, 2014-Ohio-2139, ¶ 11. "[E]vidence of tampering must have some relevance to an ongoing or likely investigation to support a tampering charge." *Id.* at ¶ 16.

{¶46} As with the carrying a concealed weapon adjudication, the evidence here is close but sufficient. CGIU officers were in the area the day of K.J.'s arrest to investigate ShotSpotter alerts. Thus, the initial purpose of their investigation was firearms-related. K.J. wore a crossbody bag of the type known to carry concealed weapons. He immediately began to run when he saw the police walking towards him, fled into an apartment for 20 or 30 minutes, and stashed his gun in a closet, leaving

the crossbody bag on a bed.  When questioned by police, K.J. did not deny that he hid the gun, only stating that he did not remember where he hid it.

**{¶47}** From these facts, the juvenile court could reasonably infer that K.J. knew police were investigating the firearm, as he fled from their attempt to question him and then immediately hid the weapon in a closet.  Stated another way, the juvenile court could reasonably infer that K.J. ran away and hid the gun because he knew he might be investigated for carrying it.  We reject K.J.'s sufficiency challenge to his tampering adjudication.

### 3. *Obstructing Official Business*

**{¶48}** K.J. argues that there was insufficient evidence presented at the adjudication hearing to establish that he obstructed official business.  In this regard, he repeats his arguments from his suppression motion that police lacked reasonable suspicion to conduct a *Terry* stop and therefore contends that he did not obstruct officers in the performance of their lawful duties.

**{¶49}** To convict a person for the obstruction of official business, the State must prove that an affirmative act hampered or impeded a public official in carrying out their "lawful duties."  *See* R.C. 2921.31(A).  The lawfulness of the official duty is therefore an element of obstruction.

**{¶50}** As to this element, the State presented sufficient evidence that Fehrman acted lawfully in stopping K.J. to investigate the alleged jaywalking infraction.  Davis testified that he observed K.J. cross the intersection outside of the crosswalk, and Kress found K.J. even more suspicious based on his crossbody bag.  This information was relayed to Fehrman, who acted on the tips from Davis and Kress in stopping K.J.  An officer's first-hand observation of jaywalking, when relayed to a fellow officer, provides reasonable suspicion to conduct a *Terry* stop.  *See In re T.B.*, 2026-Ohio-

1309, ¶ 26-33 (1st Dist.). Thus, the evidence supported the juvenile court's conclusion that Fehrman acted lawfully in stopping K.J.

**{¶51}** K.J. contends that Davis's testimony was not credible, given the inconsistencies in the offense addresses between Davis's testimony and the offense paperwork. But credibility determinations are best left to the trial court, and the juvenile court clearly credited the officers' testimony in adjudicating K.J.[5] *See State v. Brown*, 2024-Ohio-2148, ¶ 17 (1st Dist.). Whatever questions K.J. might raise about Davis's veracity do not undermine the sufficiency of the evidence the State presented below.

**{¶52}** We accordingly overrule K.J.'s second assignment of error.

### *Conclusion*

**{¶53}** The juvenile court denied K.J.'s motion to suppress without determining whether police had reasonable suspicion to conduct a *Terry* stop, a question that is necessarily determined by the credibility of the officer who observed K.J.'s alleged jaywalking infraction. Because we lack the factual findings required to review the juvenile court's denial of the motion, we reverse the juvenile court's judgments and remand the matter for the juvenile court to make the necessary findings as to K.J.'s suppression motion. As sufficient evidence supports K.J.'s delinquency adjudications, the State may proceed with further adjudicatory proceedings following the juvenile court's resolution of K.J.'s motion to suppress.

Judgments reversed and cause remanded.

**CROUSE** and **BOCK, JJ.,** concur.

---

[5] While the juvenile court accepted Davis's testimony as true in adjudicating K.J. of the jaywalking offense, it made no determination of Davis's credibility following the suppression hearing and resolved the suppression motion without determining whether Davis's observations gave rise to reasonable suspicion to stop K.J. The juvenile court's different approach to Davis's credibility at the two hearings explains the differing nature of our holdings.